UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

LEAH S. TORREGIANO,

                                        Plaintiff                                  AMENDED[1]
                                                                          DECISION AND ORDER
-vs-
                                                                          11-CV-6300 CJS(JWF)

MONROE COMMUNITY COLLEGE,

                                        Defendant

———————————————————————————

APPEARANCES

For Plaintiff:                    Leah S. Torregiano, *pro se*
                                        7905 19th Ave Drive West
                                        Bradenton, Florida 34209

For Defendant:                Adam M. Clark, Esq.
                                        Monroe County Department of Law
                                        39 West Main Street
                                        Rochester, New York 14614

INTRODUCTION

        This is an action in which Leah Torregiano ("Plaintiff") alleges that her former

employer, Monroe Community College ("the College" or "Defendant"), retaliated against

her in violation of Title VII.  Now before the Court is Defendant's motion for summary

judgment (Docket No. [#43]) and Defendant's motion to amend the Answer [#49].  The

application to amend is denied, and the application for summary judgment is granted in

part and denied in part, though the majority of Plaintiff's claim may go forward.

BACKGROUND

———————————————————

        [1]The only purpose of the amendment is to remove former footnote 40, which was inadvertently
included and contained no text.

1

In 1978 Plaintiff began working for Defendant as a Student Intern.  Plaintiff continued working for Defendant for approximately thirty-two years, until she resigned on September 7, 2010, having attained the title of Assistant Director of Public Safety. For most of that period it appears that Plaintiff was satisfied with her employment, which she performed at Defendant's main campus in Brighton, New York ("Brighton Campus").  However, in or about 2006 Defendant hired a new Director of Public Safety, Lee Struble ("Struble").  As discussed further below, over the next several years, Plaintiff had certain disagreements with Struble, and with other members of the College's administration, about her job description, about the qualifications of a male co-worker, John Mallaber ("Mallaber"), and/or about the operation of the Public Safety Department.  Plaintiff subsequently filed several complaints with the U.S. Equal Employment Opportunity Commission ("EEOC").  After those complaints were dismissed at the administrative level, Defendant made significant changes to the Public Safety Department, and to Plaintiff's working conditions, coinciding with the fact that Defendant was taking over public safety operations at its Damon City Campus in downtown Rochester, New York ("Damon Campus"), where such operations had previously been provided by a private contractor.  Essentially, Defendant placed Plaintiff in charge of the newly-formed Public Safety Department at Damon Campus. Nevertheless, Plaintiff maintains that such changes, along with Defendant's subsequent decision to promote Mallaber to the same job title that she held, and to give him responsibilities at the Brighton Campus which she previously performed,  were retaliatory and amounted to a constructive discharge, in violation of Title VII.  Except as

2

otherwise indicated the following are the facts of this case, viewed in the light most favorable to Plaintiff.

In 2004 Plaintiff was promoted to the position of Assistant Director of the Public Safety Department.  At that time, the Director of Public Safety was Robert Wiesner ("Wiesner").  As mentioned earlier, Defendant had two campuses, Brighton and Damon. The Brighton Campus is located in Brighton, a suburb of Rochester, while the much-smaller Damon Campus is located approximately four miles away, in downtown Rochester.  According to the College's website, the Brighton Campus sits on 300 acres and includes sixteen academic and administrative buildings, while the Damon Campus is a 200,000 square foot facility, taking up only two floors of Rochester's historic Sibley Building.  Further, while the Brighton Campus has many parking areas, parking for the Damon Campus consisted of a single parking garage.  Between 2004 and 2008, all of Plaintiff's job duties were performed at the Brighton Campus, since almost all public safety operations at the Damon Campus were provided by a private contractor.

Plaintiff's duties as Assistant Director involved assisting the Director with all public safety and parking matters, and more specifically included the following: 1) directly supervising public safety officers and employees, of which there were approximately sixteen;[2] 2) preparing performance reviews for all supervised staff; 3) acting as liaison with faculty, students and outside law enforcement agencies; 4) handling of budgets for Public Safety Department and Parking Department; 5) coordinating the hiring of staff; 6) maintaining department web pages; and 7)

---

[2]Plaintiff's Deposition ("Pl.Dep.") at pp. 13-14.

3

coordinating security for all special events.

When Plaintiff became Assistant Director, her job description also included a statement that the Assistant Director was "second in command" to the Director of the Public Safety Department, and would serve as Acting Director in the Director's absence. Consequently, Plaintiff served as Acting Director for many months, in or about 2005-2006, while the College was searching for a new Director to replace Wiesner.

Eventually, in or about 2006, the College hired Struble as the new Director of Public Safety. Shortly after assuming that position, in February 2007, Struble prepared Plaintiff's performance evaluation for the period 2004-2006, even though he had only had the opportunity to observe Plaintiff for a few months during that period. Struble gave Plaintiff a glowing review, indicating that she demonstrated "exceptional performance" in ten categories, and "better than expected" performance in the five remaining categories.[3] As for areas of improvement, Struble indicated only that Plaintiff was sometimes late to meetings, and that "sometimes [her] thoughts and opinions about others may not be constructive to department morale."[4]

In or about late 2006 or early 2007, Struble told Plaintiff that he was planning to re-structure the Public Safety Department by, *inter alia*, adding a position entitled Assistant Director of Operations of Public Safety.[5] Struble indicated that he was

---

[3]Docket No. [#46-2] at pp. 25-26.

[4]Docket No. [#46-2] at p. 26.

[5]*See*, Docket No. [#46-3] at p. 2, ¶ 8.

4

considering hiring Mallaber for the envisioned Assistant Director of Operations position. In that regard, Mallaber had extensive experience as a police officer, and had also worked for the College for many years as a part-time investigator.  However, Plaintiff expressed her objections to Struble's plan, stating that there had never before been two Assistant Directors, and further, that Mallaber had only an Associate's Degree, whereas the job title for Assistant Director required at least a Bachelor's Degree.[6]  Plaintiff indicated, therefore, that Mallaber was unqualified to hold the same job title that she held.

In May 2007, a position became available at the College for "Coordinator of Operations" within the Public Safety Department, and Struble hired Mallaber for the position.[7]  As Coordinator of Operations, Mallaber was below Plaintiff in the chain of command.  Nevertheless, Plaintiff maintains that Struble began "gradually transferr[ing]" some of her duties to Mallaber, including coordinating special events on campus, overseeing key control, and supervising patrol officers and investigators.[8]

Additionally, Struble deviated from the practice of former Directors, in that during his absences, he did not make a written designation as to who he was leaving in charge of the Public Safety Department.  According to Plaintiff, Struble "indicated that he could alternate between leadership or not leave anyone in charge."[9]

_____

[6]Pl. Dep. at p. 20.

[7]Docket No. [#46-3] at p. 2, ¶ 8.

[8]Docket No. [#46-3] at p. 5,  ¶ 22; Pl. Dep. at p. 19.

[9]Docket No. [#46-3] at p. 3, ¶ 13.

In May 2008, Struble presented Plaintiff with a new Assistant Director's job description, which omitted any reference to her being "second in command."  According to Plaintiff, when she pointed out that fact to Struble, he indicated that he was not aware that the job description had been changed.  Plaintiff filed a grievance with her labor union, since the relevant collective bargaining agreement ("CBA") required Struble to involve Plaintiff in the process of amending her job description.  Struble subsequently admitted that he had changed the job description, but claimed that he had been unaware of the requirement that he include Plaintiff in the process.  However, Struble never restored the "second in command" language to Plaintiff's job description.

In or about July 2008, the College's Assistant Vice President, Susan Baker ("Baker"), overheard Plaintiff criticizing her to a third party.  Baker placed a disciplinary letter in Plaintiff's personnel file, characterizing Plaintiff's statements as "disrespectful" and "insubordinate."[10]  Plaintiff admitted that her criticism of Baker was inappropriate.

Plaintiff maintains that Struble continued to isolate her and favor Mallaber, in disregard of the established chain of command.  For example, Plaintiff indicates that Struble allowed Mallaber, but not her, to attend meetings of the Rochester Area Campus Security Administrators.[11]  Moreover, Plaintiff has provided a directory of Rochester Area Campus Security Administrators, dated August 2008, which lists Strubel's  and Mallaber's names, but not hers.[12]

---

[10]Docket No. [#46-6] at p. 63.

[11]Docket No. [#46-3] at ¶ 49.

[12]Pl. Rule 56 Appendix, Ex. H.

6

On September 22, 2008, Plaintiff filed EEOC complaint number 525-2008-01251, alleging sex-based disparate treatment and retaliation, in violation of Title VII. Plaintiff indicated that Struble's actions, in giving Mallaber her duties and changing her job description without her notice, were discriminatory.  Plaintiff further alleged that she and Mallaber were being given "equal responsibility," even though he was less qualified than her academically, and below her in the chain of command.

On or about September 26, 2008, Plaintiff had a discussion with Struble in which she complained that Mallaber was circumventing her authority to oversee the parking program, by "posting additional overtime without consulting [her]."[13]  Struble accused Plaintiff of being "very argumentative, confrontational and disrespectful," and placed a disciplinary letter in Plaintiff's personnel file.[14]  However, Plaintiff denies Struble's characterization.

On November 5, 2008, the EEOC issued Plaintiff a right-to-sue letter concerning complaint number 525-2008-01251.  Plaintiff, though, did not commence a federal Title VII lawsuit within ninety days thereafter.

In or about mid-November 2008, a student stabbing occurred on the Brighton Campus.  Subsequently, on November 21, 2008, during a meeting with Baker, Plaintiff expressed her opinion that the Public Safety Department had mishandled the incident, since it had been aware that the perpetrator had previously threatened violence, but had not properly investigated the prior threat.  Baker characterized Plaintiff's statements

---

[13]Pl. Dep. at p. 30.

[14]Pl. Dep. at p. 30.

as disrespectful and insubordinate, though Plaintiff denies that accusation.  On December 9, 2008, Plaintiff was summoned to a meeting with Baker and other administrators, at which, Plaintiff maintains, Baker misstated what she had said during their prior meeting, in order to make it appear that Plaintiff was threatening to draw negative media attention to the College.  Baker subsequently placed another letter of discipline in Plaintiff's personnel file.

In early February 2009, Plaintiff, who was on sick leave, was informed by her union president that the College's attorney had advised him that the College intended not to renew her contract, and that a performance review would be prepared in order to justify that decision.

On February 17, 2009, Struble issued Plaintiff a performance review for the period 2007-2009.  The performance review was diametrically opposed to Struble's prior review, in that it harshly criticized Plaintiff's performance in almost every category. For example, Struble gave Plaintiff a rating of "satisfactory" in four categories, and a rating of "improvement needed" in the remaining thirteen categories, whereas two years earlier he had rated her as either "exceptional" or "better than expected" in all categories.  Struble alleged that Plaintiff's attitude toward him and other co-workers was toxic, stating for example: "I am not certain exactly when you became so negative about the Public Safety Department, Student Services and College, but your open hostility has created a near impossible work environment for the vast majority of the staff that has to work with you."[15]  Plaintiff maintains, though, that Strubel's evaluation was "a

_____

[15]Docket No. [#46-6] at p. 66.

complete fabrication,"[16] and that he was merely creating a record upon which to terminate her employment, out of retaliation.  Plaintiff responded in writing to the appraisal, denying Strubel's statements and charging that the appraisal was retaliatory.

On March 13, 2009, and apparently in response to pressure from Plaintiff's union,[17] the College's President, Susan Salvador ("Salvador"), renewed Plaintiff's employment, but only for a term of one year.[18]  In that regard, under the CBA, Plaintiff would have ordinarily been entitled to a three-year contract extension, but due to Strubel's evaluation, she was only given a one-year extension.  Additionally, Salvador indicated that Plaintiff would be placed on a performance improvement plan ("PIP").

On March 27, 2009, Plaintiff filed another EEOC complaint, number 525-2009-00509, alleging "further retaliation/retaliatory harassment," in violation of Title VII.  More specifically, Plaintiff alleged that Strubel's review was the "worst performance evaluation that [she had] ever received," and, in fact, the only negative evaluation that she had ever received.  Plaintiff further indicated that the evaluation was false and retaliatory, and reflected Defendant's attempt at "building a file to terminate [her] . . . or otherwise persuade [her] to retire."

On April 9, 2009, Struble issued Plaintiff a one-page PIP, which included directions such as, "treat[ ] others with decency and respect at all times," "[h]ave no incidents in which your words or actions are insubordinate or disrespectful" and

---

[16]Pl. Dep. at p. 33; *see also*, p. 41.

[17]Docket No. [#46-3] at ¶ 35.

[18]Docket No. [#46-6] at p. 82.

"[m]anage your anger and have no incidents in which you are hostile, aggressive, sarcastic or demeaning or threatening to others."[19]

On May 1, 2009, Plaintiff filed an amendment to EEOC complaint number 525-2009-00509, alleging further "retaliation/retaliatory harassment."  Specifically, Plaintiff alleged that subsequent to the filing of her EEOC complaint on March 29, 2009, she had received "more unnecessary and undue criticism of [her] work," which she believed to be retaliatory.

Beginning in "early Summer 2009,"[20] Struble directed Plaintiff to begin performing certain Public Safety duties at the Damon Campus, in addition to her remaining duties at the Brighton Campus.[21]  More specifically, Plaintiff was designated to oversee all public safety functions at the Damon Campus, while still supervising parking and information management services at the Brighton Campus.[22]  Plaintiff indicates that she had no objection to the assignment, since she understood that it would be only temporary.  Further, Plaintiff indicates that her "responsibilities at Damon were not complex or time consuming," and that she still spent about half of her time working at the Brighton Campus.[23]

---

[19]Docket No. [#46-6] at p. 83.

[20]Docket No. [#46-3] at ¶ 63; see also, Pl. Dep. at p. 44 (Indicating that she began working at Damon Campus "[a]round July '09.").

[21]See, Docket No. [#46-6] at p. 90, Struble Memo dated August 27, 2009 (Referring to Plaintiff's "new responsibilities at the Damon City Campus.").

[22]See, Docket No. [#46-2] at ¶ 31.  While this document is not itself admissible evidence, there does not appear to be any dispute concerning the scope of Plaintiff's duties when she was initially assigned to begin working part-time at the Damon Campus.

[23]Docket No. [#46-3] at ¶ 54.

At around this same time, in July 2009, Struble denied Plaintiff's request to be allowed to attend Incident Command System ("ICS") training, which she had been allowed to do previously.  In that regard, Struble questioned whether Plaintiff should be permitted to attend the training on company time, and whether the College should vouch for her being "in good standing,"[24] which was a requirement for her to attend. Eventually, Struble relented and gave permission for Plaintiff to attend the training, provided that she did so on her own personal vacation time.

On July 27, 2009, Plaintiff filed a second amendment to EEOC complaint number 525-2009-00509, alleging still further retaliation.  Specifically, Plaintiff stated that on June 9, 2009, she was offered "a new position within the college," with "additional responsibilities," referring to her duties at Damon Campus, but had not yet "received a revised current job description."  Further, Plaintiff indicated that Struble had denied her request to participate in training.  According to Plaintiff, Struble's decision in that regard amounted to "holding her back" "from advancing personally and professionally within the college and [her] career."

On November 24, 2009, Struble notified Plaintiff that he would be removing her from her office at the Brighton Campus, which she had occupied for many years.  More specifically, Struble indicated that the College was going to renovate the Public Safety Department's Ward Room, which Plaintiff maintains was a locker room in the basement of the building, move Plaintiff's office to that location, and then relocate the Department's Investigators, who were overseen by Mallaber, into Plaintiff's former

---

[24]Docket No. [#46-6] at pp. 85-91.

office.[25]   Plaintiff objected to that plan, observing, *inter alia*, that as Assistant Director, her office should be located in the Administrative Suite, while the Investigators were mainly "part time/seasonal staff."[26]   However, Struble overruled Plaintiff's objections.[27]

On December 1, 2009, Struble gave Plaintiff a new proposed job description, which included duties at both the Brighton Campus and Damon Campus.[28]   More specifically, the job description essentially indicated that Plaintiff would be in charge of all public safety operations at the Damon Campus, while retaining the following duties that also pertained to the Brighton Campus: the Parking Program, the Emergency Response Plan, and budgets for the Public Safety Departments and Parking Departments.

On December 15, 2009, the EEOC issued Plaintiff a right-to-sue letter concerning complaint 525-2009-00509, as amended. Plaintiff, though, did not commence a federal Title VII lawsuit within ninety days thereafter.

On or about January 15, 2010, Struble informed Plaintiff that he was transferring her to the Damon Campus full time, where she would be working under a new job description.[29]   According to Plaintiff, this was a surprise to her, since it was her understanding that she would continue to work at both campuses, based on the job description that Strubel had given her the previous month.  On January 21, 2010,

---

[25]Docket No. [#46-6] at p. 99.

[26]Docket No. [#46-6] at p. 99.

[27]Docket No. [#46-6] at p. 100.

[28]Docket No. [#46-6] at p. 103.

[29]Docket No. [#46-6] at pp. 104-105.

Struble sent Plaintiff an email, referencing the need for her to vacate her office at the Brighton Campus, so that Mallaber could use it.[30]

Despite the fact that Struble removed essentially all of Plaintiff's Brighton Campus duties from her job description, he directed her to finish two projects (BOSSCars parking database and GreenSaver rideshare program) which required her to spend "a majority of [her] time" at the Brighton Campus, though she no longer had an office there.[31]

On January 25, 2010, the College's President, Salvador, approved Plaintiff's new job description, which appears to have eliminated all of Plaintiff's former duties at the Brighton Campus, with the exception of overseeing the College's Emergency Response Plan and the Public Safety Department's website.[32]

On January 27, 2010, Plaintiff filed her final EEOC complaint, number 525-2010-00267, alleging retaliation in violation of Title VII.  Specifically, Plaintiff alleged that the College was retaliating against her as a result of her March 29, 2009 EEOC complaint, as amended.  Plaintiff stated that the retaliation consisted of a "significant diminution of [her] responsibilities as Assistant Director of Public Safety," involving the following: 1) she was no longer in charge of administering the parking program; 2) her key/access control "for the entire campus" was removed; and 3) she was no longer in charge of "administrative oversight" of the parking budget and public safety budget.  As further

---

[30]Docket No. [#46-6] at p. 104.

[31]Docket No. [#46-3] at ¶ 66.

[32]Docket No. [#46-6] at p. 108.

evidence of retaliation, Plaintiff indicated that the College had transferred her to Damon Campus full time, against her wishes.

On March 25, 2010, the College's new President, Ann Kress ("Kress"), renewed Plaintiff's contract for an additional year.[33]

Meanwhile, Plaintiff concluded that Mallaber, in his position as Coordinator of Operations, was violating various "policies and procedures," and that he was committing "unethical and potential[ly] criminal activities that would discredit and bring bad publicity to the college."[34]  Plaintiff expressed her concerns about Mallaber to Struble on several occasions, including in mid-July 2010.[35]  However, shortly thereafter, Struble announced that he was promoting Mallaber to the same job tile as Plaintiff, "Assistant Director," even though Mallaber did not meet the educational requirements for the job.[36]

On August 23, 2010, Plaintiff resigned, effective September 7, 2010.  Plaintiff subsequently applied for New York State unemployment insurance benefits.  However, following a hearing, the New York State Department of Labor denied Plaintiff's request for unemployment benefits, on the grounds that she had voluntarily left her employment without good cause.

Plaintiff indicates that when she complained about being transferred to Damon Campus full time, the College explained that it was necessary because "they needed a

---

[33]Docket No. [#46-6] at p. 111.

[34]Docket No. [#46-3] at ¶ 66.

[35]Docket No. [#46-3] at ¶¶ 69-70, 73.

[36]Docket No. [#46-3] at ¶ 71.

full time administrator at Damon."[37]   However, after Plaintiff resigned, the College never

hired a new Assistant Director to fill her position at the Damon Campus.[38]  Instead, the

Damon Campus has continued to be overseen by the same Coordinator who had been

assigned to the Damon Campus for years prior to the College's decision to transfer

Plaintiff there.

On March 14, 2011, the EEOC issued Plaintiff a right-to-sue letter regarding

charge number 525-2010-00267.  Within ninety days thereafter, on June 15, 2011,

Plaintiff commenced this action, alleging retaliation under Title VII, against both Monroe

County, New York, and the Defendant College.  The Complaint [#1] refers to Plaintiff's

EEOC complaints filed in 2008 and 2009, and alleges that Plaintiff subsequently

experienced retaliation.  In pertinent part, the Complaint states as follows:

18.  . . . [I]n retaliation for all of Plaintiff's prior acts of protected activity,
[she] was subject to a significant diminution of her responsibilities as
Assistant Director of Public Safety at the Brighton Campus.

19. Specifically: (1) significant job tasks were removed from Plaintiff's job
responsibilities and title; (2) key access for the entire campus was
removed from Plaintiff's job responsibilities; (3) the task of administrative
oversight of the parking and public safety budgets were removed from
Plaintiff's job responsibilities; (4) although Plaintiff had previously
volunteered to implement a new program at a different campus location,
Plaintiff was compelled to work full time at this assignment with a
concomitant and significant reduction of Plaintiff's job responsibilities as
stated above.

20. On or about November 24, 2009, Plaintiff was informed that she was

_____

[37]Pl. Dep. at p. 27.

[38]Docket No. [#46-3]  at p. 17.

being transferred from the Brighton Campus to the Damon City Campus, a less desirable location, even though Plaintiff's projects are specific to the Brighton Campus, and that as Assistant Director, Plaintiff's office should be in the administrative suite for the Department of Public Safety.

\*\*\*

23. In August of 2010, defendant promoted a male co-worker, who did not have the same credentials as the Plaintiff, to the same position and title as the Plaintiff.[39]

24. In good faith, Plaintiff believed that this action was discriminatory and that Plaintiff may be held liable, as Assistant Director, for this individual's actions since he had far less experience than Plaintiff.

\*\*\*

26. Fearing that she would be held responsible for her co-worker's malfeasance and lack of experience, Plaintiff was constructively discharged on August 23, 2010, effective September 6, 2010.

Complaint [#1].

Defendants filed a motion to dismiss [#11], and on June 28, 2012, the Court, by the Honorable Michael A. Telesca, Senior District Judge, granted Monroe County's motion to dismiss, leaving the College as the only defendant in this action.

On August 5, 2013, Judge Telesca transferred this action to the Honorable Frank P. Geraci, United States District Judge.

On August 22, 2014, Defendant filed the subject motion [#43] for summary judgment.[40]   Defendant maintained that the only claims in this action that are both

---

[39]An earlier Decision and Order of the Court mistakenly indicated that according to the Complaint, Plaintiff was passed over for a promotion that was awarded to Mallaber. *See*, Decision and Order [#17] at p. 1 (Stating that Plaintiff had alleged that she "was overlooked for a promotion that went to a male employee."). In fact, though, the Complaint merely alleges that Mallaber was promoted to the same job title as Plaintiff.

[40]Defendant provided Plaintiff with the "Irby" Notice to *Pro Se* Litigants as required by Local Rule of Civil Procedure 56(b). (Docket No. [# 43-6] ).

timely and exhausted are the claims expressly contained in Plaintiff's January 2010

EEOC complaint.  Defendant argued that all claims arising prior to that EEOC complaint

are time-barred, since Plaintiff received right-to-sue letters pertaining to them, but did

not commence this action within ninety days thereafter.  Defendant further argued that

any retaliation that allegedly occurred after the January 2010 EEOC complaint is

unexhausted, since Plaintiff did not file new EEOC complaints concerning such

retaliation.  Defendant further contended that Plaintiff's retaliation claim lacks merit

because she did not suffer any adverse employment action, and since she has not

shown that any retaliatory adverse employment action is causally related to her

protected activity.  With regard to Plaintiff's contention that part of the retaliatory

treatment consisted of constructive discharge, Defendant argued that she is collaterally

estopped from claiming constructive discharge, since the New York State Department

of Labor denied her unemployment benefits after finding that she voluntarily quit her job

without good cause.

On October 23, 2014, Plaintiff filed her response to Defendant's summary

judgment motion, disputing all of Defendant's contentions.

On November 24, 2014, Defendant filed a motion [#49] to amend its Answer to

include the affirmative defense of collateral estoppel, in connection with its argument,

discussed earlier, that Plaintiff is collaterally estopped from claiming constructive

discharge.

On December 8, 2014, Plaintiff filed a response [#51] to Defendant's motion to

amend, and on December 16, 2014, Defendant filed a reply [#52[ to its motion for

summary judgment.

On May 14, 2015, this action was reassigned to the undersigned.  On May 21, 2015, the Court scheduled oral argument for August 6, 2015.

On August 3, 2015, the Honorable Jonathan W. Feldman, United States Magistrate Judge, issued a Report and Recommendation ("R&R") [#55], recommending that this Court deny Defendant's motion to amend its answer.  In that regard, Judge Feldman ruled, *inter alia*, that the proposed amendment would be futile, since Defendant's proposed affirmative defense of estoppel, based on the New York State Labor Department's administrative ruling that Plaintiff had quit her job without good cause, was expressly barred by New York Labor Law § 623(2).

On August 6,  2015, counsel for the parties appeared before the undersigned for oral argument.  At the outset of the hearing, Defendant's counsel indicated that Defendant would not be asserting any objections to Magistrate Judge Feldman's R&R, since New York Labor Law § 623(2) does, in fact, render the proposed amendment to Defendant's Answer futile.  Accordingly, the Court adopts the R&R in all respects, and Defendant's motion to amend [#49] is denied.  Further, Defendant's counsel conceded that Plaintiff was not required to file new EEOC complaints concerning the alleged retaliation that occurred after she filed her January 2010 EEOC complaint, since retaliation occurring after the filing of an EEOC complaint falls under the "reasonably related" exception to Title VII's exhaustion requirement. *See*, *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (Indicating that the "reasonably related" exception to Title VII's exhaustion requirement applies, *inter alia*, "where the complaint is one alleging

retaliation by an employer against an employee for filing an EEOC charge.") (citations and internal quotation marks omitted).  Accordingly, Defendant has abandoned that portion of its motion which claimed that the alleged post-January 2010 retaliation is unexhausted.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted).

Moreover, because Plaintiff is proceeding *pro se*, the Court must construe her papers liberally to raise the strongest arguments they suggest. *See, Dibbs v. Mazzarelli*,

470 Fed.Appx. 34, 2012 WL 1813671 at *1 (2d Cir. May 21, 2012).

_Exhaustion of Administrative Remedies and Timeliness_

Defendant now admits that the retaliation claim contained in Plaintiff's EEOC complaint filed on January 22, 2010, as well as the acts of allege retaliation that followed, are timely and administratively exhausted.  However, Defendant contends that any retaliation covered by Plaintiff's earlier EEOC complaints, occurring prior to the issuance of the December 15, 2009 "right to sue letter," is untimely because Plaintiff did not commence an action in Federal Court within ninety days of receiving such "right to sue letter[s]."

Defendant is correct that a Title VII claimant must commence her action in U.S. District Court within ninety days of receiving her "right to sue letter," _see, Grys v. ERIndustrial Sales, Inc._, No. 13–440–cv, 553 Fed.Appx. 61, 62 (2d Cir. Jan. 30, 2014) ("In order to successfully pursue a Title VII claim in federal court, a plaintiff must file her federal complaint within 90 days of receipt of her Right–to–Sue notice from the EEOC. _See_ 42 U.S.C. § 2000e–5(f)(1)."), and that if a claimant fails to commence a district-court action within 90 days of receiving the right to sue letter, the defendant is ordinarily entitled to raise the affirmative defense of untimeliness.  Plaintiff did not timely commence an action within ninety days of receiving her right-to-sue letters, with the exception of the last one.

However, where a plaintiff is pursuing a retaliation claim and at least one of the alleged adverse employment actions is timely, the Court may consider other _untimely_ alleged acts of retaliation as background evidence supporting the timely claim:

> [When] an employee's allegations of retaliation extend beyond the
> limitations period, the circumstances surrounding the claim will determine
> precisely what consideration is owed to the time-barred conduct.  The
> statute of limitations requires that only one alleged adverse employment
> action have occurred within the applicable filing period. But, evidence of
> an earlier alleged retaliatory act may constitute relevant background
> evidence in support of that timely claim.  Hence, relevant background
> evidence, such as statements  by a decisionmaker or earlier decisions
> typifying the retaliation involved, may be considered to assess liability on
> the timely alleged act.

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-177 (2d Cir. 2005) (citations and

internal quotation marks omitted).  However, a claimant may not "revive" stale claims,

which were not asserted in a district-court action within ninety days after receiving a

right-to-sue letter, by re-asserting them in a new EEOC complaint and then obtaining a

new right-to-sue letter. *See, Bowen-Hooks v. City of New York*, 13 F.Supp.3d 179, 202

(E.D.N.Y. 2014) ("Plaintiff cannot 'save' her claims regarding the acts that were the

subject of her 2006 EEOC charge, and for which she received a right-to-sue letter, by

including them in her 2010 EEOC charge.  . . .  While Plaintiff's receipt of the first right-

to-sue letter in 2006 does not bar her from bringing claims based on Defendant's

subsequent conduct, she may not rely on those claims to 'revive' the stale 2006 claims

on which she chose not to sue.") (citations omitted).

The upshot of the foregoing discussion is that Plaintiff cannot recover for the

alleged retaliation that she described in her 2008 and 2009 EEOC complaints, because

she failed to commence a federal lawsuit within ninety days after receiving the right-to-

letters pertaining to those EEOC complaints.  However, the Court may, and will,

consider those untimely acts of alleged retaliation as evidence to support the timely

retaliation claim.  Further, the matters set forth in Plaintiff's January 2010 EEOC complaint are timely and administratively exhausted, as are the reasonably-related acts of retaliation that allegedly occurred between January 2010 and August 2010, since Plaintiff commenced this action within ninety days after receiving the right-to-sue letter pertaining to the January 2010 EEOC complaint.  More specifically, Plaintiff's actionable retaliation claim covers the transfer of Plaintiff to the Damon Campus full time, the transfer of Plaintiff's remaining Brighton Campus duties and privileges to Mallaber, and the promotion of Mallaber to Assistant Director at Brighton Campus.

### *Retaliation*

Defendant further maintains that Plaintiff cannot maintain a retaliation claim based on the alleged retaliation between January 2010 and August 2010, since the complained-of acts were not sufficiently severe to qualify as retaliation under Title VII, and since Plaintiff has not shown a sufficient causal connection between such acts and her protected activity.

However, the Court disagrees.  In that regard the legal principles concerning retaliation claims under Title VII are well settled:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would

be sufficient to permit a rational finder of fact to infer a retaliatory motive."
*Id*. (internal quotation marks omitted).

If the plaintiff sustains this initial burden, "a presumption of retaliation
arises." *Id*. The defendant must then "articulate a legitimate,
non-retaliatory reason for the adverse employment action." *Id*. If so, "the
presumption of retaliation dissipates and the employee must show that
retaliation was a substantial reason for the adverse employment action."
*Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive
played a part in the adverse employment actions even if it was not the
sole cause[;] if the employer was motivated by retaliatory animus, Title VII
is violated even if there were objectively valid grounds for the [adverse
employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d
Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).  In the instant case it is

undisputed both that Plaintiff engaged in protected activity by filing an EEOC complaint,

and that Defendant was aware of the protected activity.[41]

However, with regard to the third element of a prima facie case, Defendant

insists that Plaintiff did not suffer an adverse employment action when she was

transferred to Damon Campus full-time and her duties at Brighton Campus were given

to Mallaber, since she volunteered for the transfer even though she was expressly told

that the transfer might become permanent.  Defendant further contends that Plaintiff

kept the same job title and same salary, and that her responsibilities were not reduced,

and in fact, may have been increased at the Damon Campus. *See*, Def. Memo of Law

[#43-3] at p. 9 ("A comparison between the two job descriptions does not show any

overall decrease in responsibilities, and in fact, it appears that Plaintiff ha[d] more

responsibilities in the new position.").  According to Defendant's counsel, "[t]here simply

---

[41]*See*, Def. Memo of Law [#43-3] at p. 11 (Admitting that those two elements are not disputed).

wasn't anything bad about the job reassignment for the Plaintiff."[42]

The Court again disagrees, and finds that Plaintiff has demonstrated a triable issue of fact as to whether she suffered an adverse action.  In this regard, to make a prima facie showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*,  461 F.3d 199, 207 (2d Cir. 2006) ("*Kessler*") (*quoting  Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).  In *Kessler*, the Second Circuit noted that an adverse employment action may include a job transfer that "results in a change of responsibilities so significant as to constitute a setback to the plaintiff's career," a transfer "from an elite unit to one that [is] less prestigious," or a transfer that effects a "radical change in [the] nature of the plaintiff's work." *Kessler*, 461 F.3d at 206 (citations and internal quotation marks omitted).  Furthermore in *Kessler*, the Circuit Court held that even where a plaintiff retains the same title and salary following a transfer, he may demonstrate an adverse action by showing that he has been *de facto* "stripped of [his job] responsibilities and not allowed to perform those functions." *Id.*, 461 F.3d at 209.

Here, Plaintiff vigorously disputes Defendant's assertion that she was told, when she initially agreed to work at Damon Campus part-time, that the position would eventually become full-time.  More significantly, and contrary to Defendant's assertion

---

[42]Def. Memo of Law [#43-3] at p. 13.

that Plaintiff had comparable duties at Damon Campus, Plaintiff indicates that at Damon Campus, her responsibilities "were not complex or time consuming," and could be performed on a part-time basis.[43]   This contention seems consistent with the undisputed fact that after Plaintiff resigned, the College never hired anyone to take her place.  Further, Plaintiff states:

> When the College realized they wouldn't be able to fire me, they took action by making the transfer to Damon full time, relieving me of the previous level of responsibility, scope of practice and authority.  This transfer reduced future career prospects for me by isolating me to a satellite campus with little responsibilities and limiting my exposure to the main campus.

Docket No. [#46-3] at ¶ 72.  Plaintiff states that the transfer to Damon Campus was, "[i]n essence, . . .  a demotion without a change in title or pay."[44]

As already mentioned, Defendant maintains that Plaintiff's argument on this point is false, since *on paper*, she appears to have had the same responsibilities at Damon Campus as she had at Brighton Campus.  However, that argument assumes that the two campuses are comparable, which they clearly are not.  As noted earlier, Brighton Campus is the College's main campus, sitting on 300 acres and including sixteen academic and administrative buildings, while Damon Campus is tiny by comparison, comprising only 200,000 square feet of an office building.  While the parties do not discuss it, it seems reasonable to infer that the number of students at the Damon Campus was quite small in comparison to those at the Brighton Campus.  In any event,

---

[43]Docket No. [#46-3] at ¶ 54.

[44]Pl. Dep. at p. 26.

there is an issue of fact as to whether the transfer would have dissuaded a reasonable employee in Plaintiff's position from complaining about unlawful discrimination.

Defendant nevertheless argues that Plaintiff has also failed to demonstrate a triable issue of fact as to causation, stating:

> Plaintiff's move to a new job location was not done for any retaliatory or punitive reason at all and in fact part of the reason for that move was to attempt to improve the Plaintiff's job conditions, by distancing her from a coworker [Mallaber] that she was not getting along with.  The main reason that the Plaintiff was moved however was that the College decided after many years of working with a private security contractor at the Damon City Campus to move to providing security through the College's own Public Safety Department.  . . .   The Plaintiff's new job at the Damon City Campus was extremely important to the College, and placing her in that job at that time of the difficult transition away from private contract security was in fact recognition of the Plaintiff's valuable skills and abilities as an Assistant Director of Public Safety.
>
> ***
>
> The Plaintiff, with her years of valuable experience in MCC's Public Safety Department was the ideal candidate for this position.  This was not discrimination or retaliation; it was a restructuring, and . . . it worked largely to the Plaintiff's benefit.

Def. Memo of Law [#43-3] at pp. 7-8, 14.  Defendant further contends that Plaintiff cannot rely on "temporal proximity" to establish causation, since her last EEOC complaint, prior to her being transferred to Damon Campus full time, was five months earlier, on July 27, 2009, when she filed the second amendment to her March 2009 EEOC complaint.

Plaintiff, however, counters that the entire record creates a reasonable inference as to a causal nexus between her protected activity and the complained-of adverse employment actions.  The Court agrees and finds that Plaintiff has demonstrated a

triable issue of fact, both as to the causation element of her prima facie case, and the pre-textual nature of Defendant's proffered reason.  At the outset, Defendant's suggestion that it transferred Plaintiff to Damon Campus because she was a highly-valued employee rings hollow, since she was initially sent there at the very same time that Struble was unwilling to allow her to attend training, in part because he was unwilling even to certify that she was a member of the Public Safety Department "in good standing." *See*, Docket No. [#46-6] at p. 89 ("I do not feel that Public Safety or the College should sign this nomination form indicating that 'I certify that this person is in good standing[.]").  Further, Defendant's assertion that the transition at Damon Campus, involving the elimination of the private security contractor, was a "difficult" one that required Plaintiff's expertise, is belied by her contention that she had very little to do at Damon.  Similarly, Defendant's insistence that it transferred Plaintiff to Damon Campus because it was imperative that the campus have its own Assistant Director seems dubious, since the College never filled the position after she resigned.

But apart from all of that, Plaintiff maintains that the negative things that were said and written about her by Struble, Baker and others, after she began to complain about Mallaber, and which the College attempted to use to justify firing her in February 2009,  were absolutely untrue.[45]  Indeed, crediting Plaintiff's sworn statements of fact, as the Court must on a motion for summary judgment, there is a triable issue of fact as to whether the College, after it concluded that it could not fire her outright due to opposition from her union, instead retaliated against her by moving her to Damon

---

[45]The only exception to this is that Plaintiff admits that on one occasion she was caught improperly criticizing Baker.

Campus, so that it could essentially replace her with Mallaber at the main Brighton Campus.  Viewing the record in the light most-favorable to Plaintiff, a reasonable inference could be drawn that Struble intended to promote Mallaber to Co-Assistant Director, and when Plaintiff opposed that plan at least in part because she thought it was discriminatory, a pattern ensued in which Struble would retaliate against Plaintiff by building a fabricated case for firing her and taking away her duties, and she would file further complaints, followed by more retaliation.  In sum, the Court finds that there are triable issues of fact as to whether the alleged retaliation is causally related to Plaintiff's protected activity, and as to whether Defendant's proffered non-retaliatory reason is true.

Lastly, Defendant maintains that Plaintiff cannot possibly prove that she was constructively discharged.  In that regard, Plaintiff is attempting to use her alleged constructive discharge as a discrete act of retaliation. *See*, *Dall v. St. Catherine of Siena Medical Center*, 966 F.Supp.2d 167, 194 (E.D.N.Y. 2013). (Although harder to establish than most adverse employment actions, "[c]onstructive discharge is considered an adverse employment action sufficient to support a retaliation claim.").

A claimant must meet a "high standard establish that he was constructively discharged":

> Such a claim requires the employee to show both (1) that there is evidence of the employer's intent to create an "intolerable" environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he "would have felt compelled to resign."

*Adams v. Festival Fun Parks, LLC*, 560 Fed.Appx. 47, 49-50 (2d Cir. Mar. 21, 2014) (citation omitted); *see also, Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535

Fed.Appx. 9, 12 (2d Cir. Aug. 21, 2013) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.") (citation omitted).

Certain conditions have been found to be *insufficiently* serious to constitute constructive discharge, such as an employee's dissatisfaction with a job assignment, undue criticism from a supervisor, difficult or unpleasant working conditions, or a transfer to a job with reduced opportunity for promotion.  *See, e.g.*, *Petrosino v. Bell Atlantic*, 385 F.3d 210, 231 (2d Cir. 2004) ("[T]he law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title.  . . .  [Similarly,] it is doubtful that a constructive discharge claim can be established by an employee dissatisfied with reduced promotion opportunities[.]") (citation omitted); *see also, Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 Fed.Appx. at 12 ("A constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of her work . . . or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant.") (citation omitted).

On the other hand, conditions that might not constitute a constructive discharge when considered singly, might be sufficiently serious in the aggregate. *See*, *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) (A constructive discharge may be based on the cumulative effect of several adverse conditions).

29

Moreover, the Second Circuit has suggested that courts should be more willing to recognize a potential constructive discharge where there is some evidence that the employer actually wanted the plaintiff-employee to quit. *See, Petrosino v. Bell*, 385 F.3d at 231 (Referring to a lack of "evidence that the employer wished the employee to resign her position.").

Here, the Court agrees with Defendant that Plaintiff has failed to demonstrate a triable issue of fact as to whether she was constructively discharged. In that regard, Plaintiff has produced evidence that, out of retaliation, Defendant dishonestly evaluated her job performance in order to justify firing her, at the same time that it was transferring her job duties to Mallaber. Plaintiff has further produced evidence tending to show that, when the College's attempt to fire her failed, due to the intervention of her union, Defendant instead gradually transferred her to the Damon Campus, thereby leaving Mallaber as the *de facto* second-in-command of the Public Safety Department, even though he only held the job title of Coordinator.[46] Additionally, Plaintiff has shown that she had significantly reduced duties and responsibilities at the Damon Campus.[47]

However, despite all of the foregoing, Plaintiff evidently found the working

---

[46]One might argue that Struble's promotion of Mallaber to Assistant Director, and his decision to transfer some of Plaintiff's duties to Mallaber, could not have been retaliatory, since he admittedly told Plaintiff about his plan to hire Mallaber before she ever engaged in protected activity. However, the record can be viewed as indicating that at the time, Struble envisioned having two Assistant Directors at the Brighton Campus, but that after Plaintiff filed her EEOC complaints, Struble's plan changed, and he first attempted to fire her, after which he transferred her to the Damon Campus in order to effectively remove her from the main chain of command within the Public Safety Department.

[47]*See*, Pl. Aff. [#46-3] at ¶ 72 ("It was the cumulative effect of the adverse actions that led to the constructive discharge. . . . This transfer reduced future career prospects for me by isolating me to a satellite campus with little responsibilities and limiting my exposure to the main campus. It was the marginalization and the systematic dismantling of everything I had ever worked for and had achieved, educationally and professionally. It was demoralizing.").

conditions to be tolerable.  Indeed, Plaintiff was admittedly able to perform her job at

the Damon Campus between January 2010 and July 2010 without difficulty, apart from

her subjective dissatisfaction with the assignment.  It was not until Struble promoted

Mallaber to the position of Assistant Director, that Plaintiff claims her working conditions

became intolerable.  In that regard, Plaintiff contends that the "cumulative effect" of all

the alleged adverse actions created a constructive discharge.  However, while Plaintiff

may have been angry or upset that Struble chose to promote Mallaber to the same

position that she held,[48] Struble's action did not have any additional objective impact on

her working conditions.  In that regard, while Mallaber's job title may have changed,

there is no indication that his actual job duties changed.  Rather, it seems that even

prior to July 2010, Mallaber was already acting as the *de facto* Assistant Director at the

Brighton Campus.

Moreover, although Plaintiff maintains that she felt compelled to resign in order

to protect her good name and avoid any taint of scandal that might arise from

Mallaber's alleged misconduct, as well as to avoid any potential legal liability for his

actions, she has made only vague allegations of misconduct by Mallaber, and has not

offered a convincing explanation as to how she might have been held personally

accountable for his misconduct.[49]  At most, Plaintiff suggests that the reputation of the

Pubic Safety Department as a whole might have suffered if Mallaber's alleged

---

[48]Struble's promotion of Mallaber was all the more upsetting to Plaintiff because it came almost immediately after she told Struble her concerns about Mallaber's alleged wrongdoing.

[49]*See, e.g.*, Complaint [#1] at ¶ 24 ("Plaintiff believed that . . . [she] may be held liable, as Assistant Director, for this individual's actions since he had far less experience than Plaintiff.").

misconduct was made public.[50]  The Court finds that such subjective worries by Plaintiff are not sufficient to have objectively changed her tolerable work situation into an intolerable one.  Accordingly, Defendant is entitled to partial summary judgment, insofar as Plaintiff is attempting to use constructive discharge as one of her discrete instances of retaliation.

CONCLUSION

Defendant's motion to amend the Answer [#49] is denied, as Defendant's counsel has waived any objection to the Report and Recommendation [#55], recommending that the Court deny the application.  Defendant's motion for summary judgment [#43] is granted in part and denied in part.  Defendant is granted partial summary judgment on Plaintiff's claim that she suffered a constructive discharge, but the summary judgment motion is otherwise denied.

SO ORDERED.

Dated: Rochester, New York
       October 28, 2015

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[50] See, Pl. Aff. [#46-3] at ¶ 69 ("In addition to the violations of policies and procedures, there were unethical and potential criminal activities that would discredit and bring bad publicity to the college.  It was during the same time period that the Greece Police Department [The Town of Greece is a suburb of Rochester] was being investigated for alleged wrongdoing.  I was concerned as I have always been for the department and the college.").